UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

GABRIEL ALEJANDRO FERNANDEZ FERNANDEZ
(A-Number: 213 314 764),

Petitioner,

v.

KRISTI NOEM, *et al.*,

Respondents.

Case No. 1:26-cv-01999-KES-CDB (HC)

FINDINGS AND RECOMMENDATIONS TO GRANT PETITION FOR WRIT OF HABEAS CORPUS

(Doc. 1)

**7-Day Objection Period**

Petitioner Gabriel Alejandro Fernandez Fernandez, a federal immigration detainee proceeding by counsel, initiated this action on March 12, 2026, with the filing of a petition for writ of habeas corpus under 28 U.S.C. § 2241. (Doc. 1). That same day, Petitioner filed a motion for temporary restraining order ("TRO"). (Doc. 3). Petitioner is in custody of Immigration and Customs Enforcement ("ICE") at the California City Correctional Center. (Doc. 1 ¶ 2). Respondents are: the unnamed Warden of the California City Correctional Center; Markwayne Mullin, Secretary of the Department of Homeland Security ("DHS"); Todd Blanche, Acting Attorney General of the United States; Todd M. Lyons, Acting ICE Director; and the unnamed ICE Field Office Director for Enforcement and Removal Operations ("ERO"), Los Angeles Field Office.[1] *See id.*

[1] Todd Blanche is automatically substituted for Pamela Bondi, former United States Attorney

At the Court's direction (Doc. 5), Respondents filed a response to the TRO on March 16, 2026. (Doc. 7). The Court denied the TRO on March 19, 2026, and referred the matter to the undersigned for proceedings on the petition. (Doc. 8). After the Court set a briefing schedule on the petition (Doc. 9), Respondents filed a statement of intent to file no further briefing (Doc. 10) and Petitioner filed a traverse (Doc. 12). The Court thereafter directed Respondents to file supplemental briefing regarding the issue of Petitioner's Temporary Protected Status ("TPS") (Doc. 13), and Respondents timely filed the declaration of Jared Goodwin (Doc. 14).

## I. <u>Relevant Background</u>

Petitioner is a native and citizen of Venezuela who unlawfully entered the United States on or about September 3 or September 4, 2019. (Doc. 1 ¶ 23; Doc. 7 at 1-2). He was paroled, placed into removal proceedings, and issued a Notice to Appear. (Doc. 7 at 2; Doc. 7-1 at 3). Petitioner later filed an application for asylum and for withholding of removal. Petitioner was a beneficiary of TPS for Venezuelan nationals. (Doc. 1 ¶¶ 24-25).

On February 4, 2026, Petitioner was arrested and charged with first degree felony burglary with assault or battery in Osceola County, Florida. The charges remain pending. (Doc. 1 ¶ 35; Doc. 7 at 2; Doc. 7-3; Doc. 7-4). Thereafter, immigration authorities lodged a detainer and took Petitioner into custody on or about February 15, 2026. (Doc. 7 at 2; Doc. 7-7; Doc. 7-8). A "Report of Deportable/Inadmissible Alien" dated February 4, 2026, references Petitioner's detainer and arrest and records that "Subject TPS was terminated on 11/20/2025." (Doc. 7-2 at 3).

In his traverse, Petitioner argues that detainment under 8 U.S.C. § 1226(c) "applies only to limited categories of offenses and does not arise from unproven allegations alone," and states that he has no prior criminal history or "qualifying conviction." Petitioner also attaches a purported "sworn affidavit confirming that Petitioner paid rent at the residence and had permission to enter the home." (Doc. 12 at 2; *id.*, Ex. C). The purported affidavit is redacted as to the identity of the individual executing it and states, in brief, that Petitioner had a key and paid the rent for the house the individual lived in, and that he had permission to enter, and requests all charges be dropped

---

General, and Markwayne Mullin for Kristi Noem, former Secretary of DHS. *See* Fed. R. Civ. P. 25(d).

against Petitioner; it is notarized by Hope Pace on February 9, 2026. *See id.* at 17-20. Petitioner separately states that he has a "pending TPS application demonstrating continued compliance with immigration processes." *Id.* at 3 (citing Ex. B). The attached TPS application is dated January 17, 2025. *Id.* at 13. The attached form I-797A Notice of Action granting TPS indicates it is valid from March 25, 2024, to April 2, 2025. *Id.* at 14. Petitioner also attaches to his traverse a Florida state court order setting bond, dated February 10, 2026, a certificate of discharge bond, dated February 11, 2026, and Petitioner's DHS parole notice and Notice to Appear, both dated September 4, 2019. *Id.* at 8-11, 22-23.

On June 5, 2026, the Court directed Respondents to file supplemental briefing regarding the nature and circumstances of their asserted termination of Petitioner's TPS designation and the current status of any TPS application filed by Petitioner. (Doc. 13). In response, on June 12, 2026, Respondents submitted the declaration of Jared Goodwin. (Doc. 14-1). Mr. Goodwin declares he is Acting Chief – Headquarters Operations with the United States Department of Homeland Security ("DHS"), United States Citizenship and Immigration Services ("USCIS"), Service Center Operations Directorate ("SCOPS"), and has been employed with DHS since 2012. *Id.* ¶ 1. In brief, Mr. Goodwin represents that Petitioner filed a Form I-821 Application for TPS that was received by USCIS on October 3, 2023. *Id.* ¶ 6. It was approved for the period of March 24, 2024, to April 2, 2025. *Id.* ¶ 7. Petitioner's TPS status was terminated on November 20, 2025. *Id.* ¶ 8. Petitioner's re-registration form was received by USCIS on January 17, 2025; this application was then terminated on November 19, 2025. *Id.* ¶ 9. Mr. Goodwin declares that the Secretary of DHS terminated the TPS designation for Venezuela dating from 2023, notice of which was published in the Federal Register, and became effective on April 2, 2025, at 11:59 p.m. *Id.* ¶¶ 10-12. Mr. Goodwin declares that "there is a small subset of Venezuelan TPS respondents who maintain TPS until October 2, 2026," but that the Petitioner is "not part of this additional subset of cases and his TPS status remains terminated." *Id.* ¶ 13.

Mr. Goodwin attaches to his declaration the Supreme Court's decision in *Noem v. National TPS Alliance*, 606 U.S. 1062 (2025) (*id.*, Ex. 1), as well as the Federal Register Notice of termination of the October 3, 2023, designation of Venezuela for TPS (*id.*, Ex. 2). The Court also

takes judicial notice that Petitioner has a master hearing scheduled for July 30, 2026.[2]

## II. Governing Authority

### A. The Writ of Habeas Corpus

Writ of habeas corpus relief extends to a person in custody under the authority of the United States. *See* 28 U.S.C. § 2241. A district court considering an application for a writ of habeas corpus shall "award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto." 28 U.S.C. § 2243.

Relevant here, "in cases that do not involve a final order of removal, federal habeas corpus jurisdiction remains in the district court" pursuant to 28 U.S.C. § 2241 where the petitioner "challenges his confinement on statutory and constitutional grounds." *Nadaraja v. Gonzales*, 443 F.3d 1069, 1075-76 (9th Cir. 2006); accord *Flores-Torres v. Mukasey*, 548 F.3d 708, 713 (9th Cir. 2008) (holding "the district court has jurisdiction over Torres's habeas petition challenging his detention" in ICE custody).

### B. Statutory Immigration Framework (8 U.S.C. § 1225 and § 1226)

Two statutes govern the detention and removal of inadmissible noncitizens from the United States: 8 U.S.C. § 1226 and § 1225. Relevant here is the legal background presented by the district court in *Salcedo Aceros v. Kaiser*, No. 25-cv-06924-EMC, 2025 WL 2637503 (N.D. Cal. Sept 12, 2025), which the undersigned adopts herein:

> **1. <u>Full Removal Proceedings and Discretionary Detention (§ 1226)</u>**
>
> The "usual removal process" involves an evidentiary hearing before an immigration judge. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020). Proceedings are initiated under 8 U.S.C. § 1229(a), also known as "full removal," by filing a Notice to Appear with the Immigration Court. *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 520 (BIA 2011). Section § 1226 provides that while

[2] *See* https://acis.eoir.justice.gov/en/caseInformation (last visited July 18, 2026, using Petitioner's A-Number and nationality); *Daniels-Hall v. National Edu. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010) ("It is appropriate to take judicial notice of this information, as it was made publicly available by government entities ... and neither party disputes the authenticity of the web sites or the accuracy of the information displayed [ ] therein."); *Argueta v. Walgreens Co*., 760 F. Supp. 3d 1028, 1034 (E.D. Cal. 2024) (taking judicial notice of information on federal government agency's website).

removal proceedings are pending, a noncitizen “may be arrested and detained” and that the government “may release the alien on ... conditional parole.” § 1226(a)(2); *accord Thuraissigiam*, 591 U.S. at 108 (during removal proceedings, applicant may either be “detained” or “allowed to reside in this country”). When a person is apprehended under § 1226(a), an ICE officer makes the initial custody determination. *Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022) (citing 8 C.F.R. § 236.1(c)(8)). A noncitizen will be released if he or she “demonstrate[s] to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.” *Id.* (citing 8 C.F.R. § 236.1(c)(8)).

“Federal regulations provide that aliens detained under § 1226(a) receive bond hearings at the outset of detention.” *Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018) (citing 8 CFR §§ 236.1(d)(1)). If, at this hearing, the detainee demonstrates by the preponderance of the evidence that he or she is not “a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk,” the IJ will order his or his release. *Diaz*, 53 F.4th at 1197 (citing *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006)). Once released, the noncitizen’s bond is subject to revocation. Under 8 U.S.C. § 1226(b), “the DHS has authority to revoke a noncitizen’s bond or parole ‘at any time,’ even if that individual has previously been released.” *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 968 (N.D. Cal. 2019). However, if an immigration judge has determined the noncitizen should be released, the DHS may not re-arrest that noncitizen absent a change in circumstance. *See Panosyan v. Mayorkas*, 854 F. App’x 787, 788 (9th Cir. 2021). Where the release decision was made by a DHS officer, not an immigration judge, the Government’s practice has been to require a showing of changed circumstances before re-arrest. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017).

**2. <u>Expedited Removal and Mandatory Detention (§ 1225)</u>**

While “§ 1226 applies to aliens already present in the United States,” U.S. immigration law also “authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2),” a process that provides for expedited removal. *Jennings*, 583 U.S. at 303 (2018). Under § 1225, a noncitizen “who has not been admitted or who arrives in the United States” is considered “an applicant for admission.” 8 U.S.C. § 1225(a)(1). For certain applicants for admission, 8 U.S.C. § 1225 authorizes “expedited removal.” § 1225(b)(1). § 1225(b)(1) provides that:

> “If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)(C) or 212(a)(7) [8 U.S.C. § 1182(a)(6)(C) or 1182(a)(7)], the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an

> intention to apply for asylum under section 208 [8 USCS § 1158] or a fear of persecution."

Sections 8 U.S.C. § 1182(a)(6)(C) and 1182(a)(7) respectively refer to noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. Clause (iii) of § 1225(b)(1) allows the Attorney General (who has since delegated the responsibility to the Department of Homeland Security Secretary) to designate for expedited removal noncitizens "who ha[ve] not been admitted or paroled into the United States, and who ha[ve] not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph." § 1225(b)(1)(A)(iii)(II).

To summarize, under § 1225(b)(1), two groups of noncitizens are subject to expedited removal. First, there are "arriving" noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. The implementing agency regulations define "arriving alien" as applicants for admission "coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2. The second group –designated noncitizens –includes noncitizens who meet all of the following criteria: (1) they are inadmissible due to lack of a valid entry document or misrepresentation; (2) they have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility"; and (3) they are among those whom the Secretary of Homeland Security has designated for expedited removal. *Thuraissigiam*, 591 U.S. at 109; § 1225(b)(1).

"Initially, DHS's predecessor agency did not make any designation [under (3)], thereby limiting expedited removal only to 'arriving aliens,'" that is, noncitizens encountered at ports of entry. *Make the Rd. N.Y. v. Noem*, No. 25-cv-190 (JMC), 2025 U.S. Dist. LEXIS 169432, at *14 (D.D.C. Aug. 29, 2025). In the following years, DHS extended by designation expedited removal to noncitizens who arrive by sea and who have been present for fewer than two years, and to noncitizens apprehended within 100 air miles of any U.S. international land border who entered within the last 14 days. *Id.* This was the status quo until January 2025, when the Department of Homeland Security revised its § 1225 designation to "apply expedited removal to the fullest extent authorized by statute." Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025). Under this designation, expedited removal applies to noncitizens encountered *anywhere* within the United States, who have been in the United States for less than two years and are inadmissible for lack of valid documentation or misrepresentation. In short, expedited removal was expanded to apply for the first time to vast numbers of noncitizens present in the interior of the United States.

Under the expedited removal statute § 1225(b)(1), if an applicant "indicates either an intention to apply for asylum" or "a fear of

persecution," the immigration officer "shall refer the alien for an interview by an asylum officer." §§ 1225(b)(1)(A)(i)–(ii). If the asylum officer determines that the applicant has a "credible fear," the applicant "receive[s] 'full consideration' of his asylum claim in a standard removal hearing." *Thuraissigiam*, 591 U.S. at 110. If the officer determines there is no "credible fear," the officer "shall order the alien removed from the United States without further hearing or review." § 1225(b)(1)(B)(iii). However, the officer's decision may be appealed by the applicant to an immigration judge, who must conduct the review "to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination." *Id.* Detention under § 1225(b)(1) is "mandatory" "pending a final determination of credible fear of persecution and if found not to have such a fear, until removed." *Id.* (citing § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.")

[Section] 1225 also contains a provision that applies to applicants for admission not covered by § 1225(b)(1). *Jennings*, 583 U.S. at 287. This provision, 1225(b)(2), states that, subject to statutory exceptions, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a [full removal proceedings] of this title." § 1225(b)(2). In other words, noncitizens subject to 1225(b)(2) are not eligible for expedited removal but are subject to mandatory detention while their full removal proceedings are pending. This is in contrast to the default detention regime under § 1226(a), which allows for discretionary release and review of detention through a bond hearing.

**3. <u>The Government's Recent Change in Position</u>**

Until this year, the DHS has applied § 1226(a) and its discretionary release and review of detention to the vast majority of noncitizens allegedly in this country without valid documentation. This practice was codified by regulation. The regulations implementing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") state that "Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination." 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). In fact, the government has conceded in other contexts that "DHS's long-standing interpretation has been that 1226(a) [discretionary detention] applies to those who have crossed the border between ports of entry and are shortly thereafter apprehended." Dkt. No. 17 (citing Solicitor General, Transcript of Oral Argument at 44:24–45:2, *Biden v. Texas*, 597 U.S. 785 (2022) (No. 21-954)) . . .

In 2025, however, the Government's policy changed dramatically. The DHS revised its § 1225 designation to "apply expedited removal *to the fullest extent authorized by statute.*" Designating Aliens for

> Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025) (emphasis added). The Secretary of Homeland Security memorandum directed federal immigration officers to "consider ... whether to apply expedited removal" to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied." Dkt. No. 1 at ¶ 33. Officers are encouraged to "take steps to terminate any ongoing removal proceeding and/or any active parole status." *Id.* The memorandum states that DHS shall take the actions contemplated by the memorandum "in a manner that takes account of legitimate reliance interests," but states that "the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner." Huffman Memorandum (Jan. 23, 2025).
>
> Since mid-May of 2025, the Department of Homeland Security has made a practice of appearing at regular removal proceedings in immigration court, moving to dismiss the proceedings, and then re-arresting the individual in order to place them in expedited removal proceedings. Dkt. No. 1 at ¶¶ 35–40. If the immigration judge does not dismiss the full removal proceedings, ICE still makes an arrest, apparently in reliance on § 1225(b)(2)'s detention provision.

*Salcedo Aceros*, 2025 WL 2637503 at *1-4 (internal footnotes omitted).

### C. Parole Revocation

In *Y-Z-H-L v. Bostock*, 792 F. Supp. 3d 1123 (D. Or. 2025), the court explained the parole process in immigration cases and noted that before parole may be revoked, the parolee must be given written notice of the impending revocation, which must include a cogent description of the reasons supporting the revocation decision. The court held:

> Section 1182 . . . has a subsection titled "Temporary admission of nonimmigrants," which allows noncitizens, even those in required detention, to be "paroled" into the United States. This provision, at issue in this case, states:
>
>> The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and **when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for**

> **admission to the United States.**
>
> 8 U.S.C. § 1182(d)(5)(A).

*Id.* at 1133 (emphasis added). *Y-Z-H-L* determined that under the Administrative Procedure Act, immigration parolees are entitled to determinations related to their parole revocations that are not arbitrary, capricious or an abuse of discretion. *Id*. at 1146-47. An agency acts arbitrarily and capriciously by failing to make a reasoned determination or where the agency fails to "articulate[] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id*. at 1144 (footnote and citation omitted). Parole revocations in the context of the INA must occur on a case-by-case basis and may occur "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." *Id*. at 1133 (quoting 8 C.F.R. § 212.5(e)). 8 C.F.R. § 212.5(e) requires written notice of the termination of parole except where the immigrant has departed or when the specified period of parole has expired.

Applying *Y-Z-H-L* and § 212.5(e), in *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128 (W.D.N.Y. 2025), the court found that the INA requires a case-by-case analysis as to the decision to revoke humanitarian parole:

> This Court agrees that both common sense and the words of the statute require parole revocation to be analyzed on a case-by-case basis and that a decision to revoke parole "must attend to the reasons an individual [noncitizen] received parole." *See id*. There is no indication in the record that the government conducted any such analysis here. On the contrary, the letter Mata Velasquez received merely stated summarily that DHS had "revoked [his] parole." Docket Item 62-1 at 5. Thus, there is no indication that—as required by the statute and regulations—an official with authority made a determination specific to Mata Velasquez that either "the purpose for which [his] parole was authorized" has been "accomplish[ed]" or that "neither humanitarian reasons nor public benefit warrants [his] continued presence...in the United States." *See* 8 C.F.R. § 212.5(e)(2)(i). As a result, DHS's revocation of Mata Velasquez's parole violated his rights under the statute and regulations. *See Y-Z-L-H*, 2025 WL 1898025, at *13.

*Id*. at 146. And in *Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025), the court reached a similar conclusion relying on the Due Process Clause:

> . . . **even when ICE has the initial discretion to detain or release**

> **a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody**. *See Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

*Id.* (emphasis added). Other courts, including this Court, have held similarly. *See Doe v. Becerra*, 787 F. Supp. 3d 1083, 1093 (E.D. Cal. 2025); *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme Court has consistently held that non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals.").

### D. Temporary Protected Status ("TPS")

Regarding TPS, relevant here is the background presented by another judge of this Court in *Alvarez v. Chestnut*, No. 1:26-cv-01293-DC-CKD (HC), 2026 WL 604195 (E.D. Cal. Mar. 4, 2026), which the undersigned adopts herein:

> Pursuant to 8 U.S.C. § 1254, the DHS Secretary "may designate a foreign state for TPS when nationals of that state cannot return there safely due to armed conflict, natural disaster, or other 'extraordinary and temporary conditions.'" *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1010 (9th Cir. 2025) (citing 8 U.S.C. § 1254a(b)(1)(c)). This designation is permitted unless the Secretary "finds that permitting the [noncitizens] to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* The DHS Secretary selects the TPS designation period for a foreign state for a period of between six and eighteen months. *Nat'l TPS All.*, 150 F.4th at 1010 (citing 8 U.S.C. § 1254a(b)(2)). "Such a designation permits certain nationals of the foreign state, who have continuously resided in the United States since the effective date of designation, to register for employment authorization and protection from deportation for the duration of the TPS period." *Nat'l TPS All.*, 150 F.4th at 1010 (citing 8 U.S.C. § 1254a(a)(1), (b)(2)).

> On March 9, 2021, then DHS Secretary Mayorkas designated Venezuela for TPS, effective March 9, 2021, through September 9, 2022, citing “severe political and economic crisis” in Venezuela. *Nat'l TPS All.*, 150 F.4th at 1011 (citing Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure, 86 Fed. Reg. 13574, 13574 (Mar. 9, 2021)). On September 8, 2022, Secretary Mayorkas extended the Venezuelan TPS for eighteen months, from September 10, 2022 through March 10, 2024. *Nat'l TPS All.*, 150 F.4th at 1011 (citing Extension of the Designation of Venezuela for Temporary Protected Status, 87 Fed. Reg. 55024, 55024 (Sept. 8, 2022)). The extension allowed beneficiaries of the 2021 TPS designation of Venezuela to extend work authorization and protection from removal. *Id.* On October 3, 2023, Secretary Mayorkas redesignated Venezuela for TPS and extended the 2021 TPS designation of Venezuela by eighteen months. *Nat'l TPS All.*, 150 F.4th at 1011 (citing Extension and Redesignation of Venezuela for Temporary Protected Status, 88 Fed. Reg. 68130, 68130 (Oct. 3, 2023)). Beneficiaries of the 2021 TPS designation of Venezuela could extend their status through September 5, 2025, and eligible Venezuelan nationals—those who resided in the United States continuously since July 31, 2023—could register for the 2023 TPS Designation. *Id.* The registration period for the 2023 TPS Designation began on October 3, 2023. *Id.* The 2023 TPS Designation was in effect through April 2, 2025. *Id.* Secretary Mayorkas issued a notice on January 17, 2025, that consolidated the two TPS filing tracks and allowed beneficiaries of both the 2021 and 2023 TPS Designation to re-register for an eighteen-month extension that was in effect through October 2, 2026. *Nat'l TPS All.*, 150 F.4th at 1012 (citing Extension of the 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 5961–62 (Jan. 17, 2025)).
>
> On February 3, 2025, current DHS Secretary Kristi Noem issued a notice to vacate the former DHS Secretary's extension of the 2023 TPS Designation and the consolidation of the two filing tracks for 2021 and 2023 designations. *Nat'l TPS All.*, 150 F.4th at 1012 (citing Vacatur Notice, 90 Fed. Reg. 8805, 8806). On February 5, 2025, Secretary Noem issued a notice of termination of the 2023 TPS Designation, effective 60 days later on April 7, 2025. *Nat'l TPS All.*, 150 F.4th at 1012 (citing Termination Notice, 90 Fed. Reg. at 9040).

*Alvarez*, 2026 WL 604195, at *2–4.

///

**III. <u>Exhaustion</u>**

**A. Governing Authority**

"Section 2241 … 'does not specifically require petitioners to exhaust direct appeals before filing petitions for habeas corpus.'" *Laing v. Ashcroft*, 370 F.3d 994, 997 (9th Cir. 2004) (citing *Castro-Cortez v. INS*, 239 F.3d 1037, 1047 (9th Cir. 2001)). The Ninth Circuit, however, requires that, "as a prudential matter, that habeas petitioners exhaust available judicial and administrative remedies before seeking relief under § 2241." *Castro-Cortez*, 239 F.3d at 1047 (citing *United States v. Pirro*, 104 F.3d 297, 299 (9th Cir. 1997)). "Under the doctrine of exhaustion, 'no one is entitled to judicial relief for a supposed or threatened injury until the prescribed ... remedy has been exhausted.'" *Laing*, 370 F.3d at 997-98 (citing *McKart v. United States*, 395 U.S. 185, 193 (1969)). "Exhaustion can be either statutorily or judicially required. If exhaustion is required by statute, it may be mandatory and jurisdictional, but courts have discretion to waive a prudential requirement." *Id.* at 998 (citing *El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review,* 959 F.2d 742, 746 (9th Cir. 1991); *Stratman v. Watt,* 656 F.2d 1321, 1325-26 (9th Cir. 1981)). "Although courts have discretion to waive the exhaustion requirement when it is prudentially required, this discretion is not unfettered…. Lower courts … [must] first determin[e whether] the exhaustion requirement has been satisfied or properly waived." *Id.* (internal citations omitted); *see Murillo v. Mathews*, 588 F.2d 759, 762, n.8 (9th Cir. 1978) ("Although the application of the rule requiring exhaustion is not jurisdictional, but calls for the sound exercise of judicial discretion, it is not lightly to be disregarded.").

**B. Analysis**

Petitioner asserts that exhaustion "would be futile because immigration courts lack authority to remedy statutory and constructional violations." (Doc. 1 ¶ 91). Respondents do not address the exhaustion issue. *See* (Doc. 7).

The Court finds that the prudential exhaustion requirement should be waived as it would be futile to seek release by administrative means given Respondents' position that Petitioner is subject to mandatory detention under 8 U.S.C. § 1226(c), and Petitioner must remain incarcerated under that framework without individualized process. *See* (Doc. 7 at 3-4). Petitioner therefore lacks

recourse through statutory or administrative means. *See Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017) ("[A] court may waive the prudential exhaustion requirement if 'administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void.'") (quoting *Laing*, 370 F.3d at 1000).

## IV. <u>Discussion</u>

Petitioner asserts four causes of action in his petition: violation of the Immigration and Nationality Act ("INA"); violation of procedural due process under the Fifth Amendment to the U.S. Constitution; unlawful agency action; and unlawful seizure under the Fourth Amendment. (Doc. 1 at 10-15). As set forth below, because the undersigned finds that Petitioner's detention without a bond hearing violates procedural due process and as Petitioner's other claims seek the same or similar relief, the undersigned forbears from addressing Petitioner's other claims.

### A. Temporary Protected Status ("TPS")

Petitioner's entitlement to relief turns largely on the operation of 8 U.S.C. § 1254a(d)(4), which provides that a noncitizen with TPS "shall not be detained by the Attorney General on the basis of the alien's immigration status in the United States," to the facts and circumstances of his case. 8 U.S.C. § 1254a(d)(4). Resolution of his petitioner is complicated by recent legal challenges regarding TPS for Venezuelans.

#### *i. <u>Background</u>*

The TPS program provides relief to foreign nationals from specified countries in the form of temporary protection from removal due to war, natural disasters, or other extraordinary and temporary conditions. A citizen of a specified country, if already within the United States, may obtain TPS, and unlawful entry into the country will not usually preclude the granting of TPS. *See Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021).

On September 5, 2025, the Northern District of California found that the Secretary of DHS lacked the statutory authority to vacate the previous Secretary's extension of the 2023 TPS designation for Venezuela and exceeded her authority when she purported to invalidate documentation that had already been issued pursuant to the extension. *See Nat'l TPS All. v. Noem*,

798 F. Supp. 3d 1108, 1144-47 (N.D. Cal. 2025). The district court vacated the Secretary of DHS' actions under section 706 of the Administrative Procedure Act ("APA") and entered judgment in favor of plaintiffs on their claims related to vacatur and termination of the TPS designation for Venezuela. *Id.* at 1160–62, 64. On October 3, 2025, the Supreme Court stayed the district court's order "pending the disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit and disposition of a petition for a writ of certiorari, if such writ is timely sought." *Noem v. Nat'l TPS All.*, 146 S. Ct. 23, 24 (2025).

On December 10, 2025, the Northern District of California granted plaintiff's motion for declaratory relief, holding that "(1) the vacatur of the January 17, 2025, TPS extension for Venezuela was unlawful as was (2) the termination of Venezuela's 2023 TPS designation on February 5, 2025." *Nat'l TPS All. v. Noem*, No. 25-cv-01766-EMC, 2025 WL 3539156, at *2 (N.D. Cal. Dec. 10, 2025). The district court also noted that "the declaratory relief issued here may help preserve the pending status quo for individual members of the NTPSA." *Id.* The district court stayed the order for two weeks to provide the government an opportunity to appeal the decision. The government then filed an appeal. *See id.* at *1.

On January 28, 2026, the Ninth Circuit ruled that the Northern District of California "did not abuse its discretion by setting aside each of the Secretary's unlawful Venezuela Vacatur, Venezuela Termination, and Haiti Partial Vacatur in full." *Nat'l TPS All. v. Noem*, 166 F.4th 739, 768 (9th Cir. 2026), *pet for r'hrng en banc den'd*, 169 F.4th 796. The Ninth Circuit explained:

> As of January 17, 2025, Venezuela's TPS was extended through October 2, 2026. Secretary Noem acted in excess of her statutory authority when she purported to vacate the 2025 Extension, and that Extension therefore remained in effect when she attempted to effectuate the Venezuela Termination. Congress could not have been clearer: the Secretary could terminate Venezuela's TPS with at least sixty days' notice and with an effective date no earlier than October 2026. That is the beginning and end of the inquiry.
>
> We hold that Secretary Noem exceeded her authority under the TPS statute by attempting to terminate Venezuela's TPS, as extended by the 2025 Extension. Because the 2025 Extension remains in effect until October 2, 2026, Secretary Noem's attempt to terminate Venezuela's TPS with an effective date of April 7, 2025, violated the plain text of the TPS statute. *See* § 1254a(b)(3)(B) (a termination

> cannot be effective earlier than "the expiration of the most recent previous extension"). The Venezuela Termination was predicated on and inextricably intertwined with the Venezuela Vacatur; therefore, the illegality of the Vacatur must be fatal to the Termination. Because, again, that conclusion resolves this claim, we decline to reach the remainder of Plaintiffs' APA challenge.

*Id.* at 766 (citations omitted).

In its decision, the Ninth Circuit found that, under canons of statutory interpretation, 8 U.S.C. § 1254a(b)(5)(A) does not bar judicial review of a claim that the Secretary of DHS exceeded her statutory authority by vacating the prior TPS determination for Venezuela and terminating the 2025 TPS extension. *See id.* at 757, 766. The Ninth Circuit upheld the district court's grant of a "universal vacatur" that extends to non-parties and determined that the Supreme Court stay was not controlling as to the outcome of the case. *Id.* at 754, 767-68 (noting the difficulty of imposing structured relief on an individual basis and finding that, "[b]ecause the Secretary lacked authority to act in the manner that she did, the proper remedy under APA § 706(2) is to set aside her actions and restore the status quo").

On January 9, 2026, the government filed a separate appeal of the Northern District of California's December 10, 2025, decision granting declaratory relief. That case, *National TPS Alliance, et al v. Mullin, et al.*, No. 26-187, remains pending before the Ninth Circuit and is presently stayed, with the parties seeking an extension of the stay "while the Supreme Court considers the government's petition for a writ of certiorari in *Mullin v. National TPS Alliance*, No. 26-48 (U.S. filed July 13, 2026), which addresses this Court's decision in *National TPS Alliance v. Noem*, 166 F.4th 739 (9th Cir. 2026)." *See* (*National TPS Alliance, et al v. Mullin, et al.*, No. 26-187 (9th Cir. Jan. 9, 2026), Doc. 17).

On June 25, 2026, the Supreme Court held that 8 U.S.C. § 1254a(b)(5)(A) precludes judicial review of all non-constitutional claims related to TPS. *See Mullin v. Doe*, 609 U.S. ___, 2026 WL 1825840, at *7 (U.S. June 25, 2026). In *Mullin*, the Supreme Court reversed and remanded for further proceedings judgments entered in two different cases, one from the Southern District of New York and the other from the District of Columbia, which concerned the termination of TPS

designations for Syria and Haiti, respectively. *Id.* at *13. The Court held that the "Respondents' attempt to limit the judicial-review bar to the Secretary's ultimate 'determination'—not any subsidiary decision—is inconsistent with the plain meaning of the statutory text and contradicts the administrative-law principle that subsidiary decisions merge into final agency action." *Id.* at *2. The Court made no distinctions between substantive and procedural questions, holding that "Respondents' argument that § 1254a(b)(5)(A) applies only to substantive claims, not those based on alleged procedural errors, finds no support in the statutory language because a 'determination' may concern procedural or substantive questions." *Id.* at *1.

After the Supreme Court's decision in *Mullin*, some district courts have found that they are without jurisdiction to review the Secretary of DHS's termination of the TPS designation of Venezuelan individuals. *See, e.g.*, *Castillo-Salas v. Gantt*, No. CIV-26-906-PRW, 2026 WL 1879729, at *3 (W.D. Okla. June 30, 2026) ("And for the Court to find in Petitioner's favor, it would require it determine whether the DHS Secretary's vacatur and termination of Venezuela's TPS status was unlawful. However, the Court lacks jurisdiction to review the DHS Secretary's termination of Petitioner's TPS status by the plain language of the TPS statute."); accord *Carillo Celis v. Unknown Party #1*, No. 1:26-cv-1857, 2026 WL 1895469, at *2 (W.D. Mich. July 1, 2026) (finding the same); *C.D.M.V. v. Warden, Stewart Det. Ctr.*, No. 4:26-cv-261 (CDL), 2026 WL 1894277, at *1 n.1 (M.D. Ga. July 1, 2026) (denying preliminary injunction to Venezuelan national who sought immediate release due to TPS based in part on its characterization of the holding of *Mullin* that the TPS statute bars consideration of non-constitutional claims).[3]

On July 9, 2026, the government filed a petition for writ of certiorari to the U.S. Supreme Court of the Ninth Circuit's January 28, 2026, decision in *National TPS Alliance*. In that case, the Ninth Circuit's found that 8 U.S.C. § 1254a(b)(5)(A) does not bar judicial review of a claim that the Secretary of DHS exceeded her statutory authority by vacating the prior TPS determination for

[3] The undersigned notes but disregards decisions from other district courts that predate *Mullin*, finding that Venezuela's TPS designation was not lawfully withdrawn and that the Ninth Circuit has upheld vacatur of the decision of the former Secretary of DHS to terminate the TPS extension. *See, e.g.*, *Osorio Ortega v. Chestnut*, No. 1:26-cv-01085-DC-CSK (HC), 2026 WL 539377, at *4 (E.D. Cal. Feb. 26, 2026) (finding that "Secretary Noem's vacatur and termination of Venezuela's TPS has been set aside by the declaratory judgment issued on December 10, 2025").

Venezuela and terminating the 2025 TPS extension. However, the Supreme Court's decision in *Mullin* holds broadly that 8 U.S.C. § 1254a(b)(5)(A) precludes judicial review of all non-constitutional claims related to TPS. And the Supreme Court did not distinguish between substantive or procedural questions. *Mullin*, 2026 WL 1825840, at *1. As of the current date, the Supreme Court has not yet issued a certified copy of its ruling in *Mullin* to the lower courts. *See* Sup. Ct. R. 45(2).

*ii.* *Analysis*

Petitioner alleges in his petition that he has TPS. (Doc. 1 ¶¶ 24-25). However, in his traverse, he states that he has a pending application for TPS. (Doc. 12 at 3; *id.*, Ex. B). The attached form I-797A Notice of Action granting TPS indicates it is valid from March 25, 2024, to April 2, 2025. *Id.* at 14. Petitioner also attaches a TPS application dated January 17, 2025. *Id.* at 13. Plaintiff does not assert that this TPS application has been granted. Further, the Report of Deportable/Inadmissible Alien attached to Respondents' response states that "Subject TPS was terminated on 11/20/2025." (Doc. 7-2 at 3).

Respondents provide that Petitioner's application for TPS was approved for the period of March 24, 2024, to April 2, 2025. (Doc. 14-1 ¶ 7). Petitioner's TPS status was terminated on November 20, 2025. *Id.* ¶ 8. Petitioner's re-registration form was received by USCIS on January 17, 2025; this application was then terminated on November 19, 2025. *Id.* ¶ 9. The Secretary of DHS' termination of TPS for Venezuela became effective on April 2, 2025, at 11:59 p.m.[4] *Id.* ¶¶ 10-12. There remains a "small subset of Venezuelan TPS respondents who maintain TPS until October 2, 2026," but according to Respondents, Petitioner is "not part of this additional subset of cases and his TPS status remains terminated." *Id.* ¶ 13.

A TPS designation for an individual can be removed in two ways. First, the government may withdraw an individual's TPS status under certain conditions as set forth in the statute's implementing regulations. *See* 8 U.S.C. § 1254a(c)(3); 8 C.F.R. § 244.14(a). That decision must

[4] This is incorrect as the termination notice is dated February 5, 2025, and 60 days later is Sunday, April 6, 2025, with the following Monday being April 7, 2025. *See* 90 Fed. Reg. 23 at 9040; 8 U.S.C. § 1254a(b)(3)(B).

be in writing and served by personal service pursuant to 8 C.F.R. § 103.8(a)(2), among other things. 8 C.F.R. §§ 244.14(b)(1), (b)(3). There is no indication in the record that Respondents satisfy the requirements of this method.

Second, the government may terminate an entire country's TPS designation under 8 U.S.C. § 1254a(b)(3)(B). Prior to the Supreme Court's decision in *Mullin*, some courts within this circuit found that the declaratory judgment issued by the Northern District of California established that the vacatur of the extension of Venezuela's TPS designation was unlawful and, therefore, individual TPS holders retained their status. *See Bello Oropeza v. Noem*, No. CV-26-01251-PHX-SHD (JFM), 2026 WL 1597192, at *5 (D. Ariz. May 21, 2026) ("Thus, Petitioners' TPS continues because each Petitioner timely re-registered under the January 2025 extension which remains in effect through October 2, 2026."); *see also Javier Gonzalez v. Noem*, No. 5:26-cv-00357-JWH-AJR, 2026 WL 332223, at *2 (C.D. Cal. Feb. 5, 2026) ("In view of that court's grant of declaratory relief and Javier Gonzalez's timely application to extend his TPS designation to October 2, 2026, the Court concludes that Javier Gonzalez retains his TPS designation."). These courts found that this status remains even for those individuals that did not timely re-register because the government must take action to withdraw their status. *See Bello Oropeza*, 2026 WL 1597192, at *5 ("This result is consistent with 8 C.F.R. § 244.14(a)(3), which indicates that even those who, unlike Petitioners, do not re-register for TPS retain TPS unless and until the government moves to withdraw their status.") (citing *Echeverria v. Janecka*, No. 1:25-cv-01832-KES-SAB (HC), 2026 WL 44896, at *1 (E.D. Cal. Jan. 7, 2026)).

Other courts have found differently. According to these courts, the September 5, 2025, order of the Northern District of California is, despite the affirmance of the Ninth Circuit, subject to a Supreme Court stay but, by contrast, that the December 10, 2025, order did not set aside the challenged actions and provided declaratory relief to members of the nonprofit National TPS Alliance, which may have been permissible under the stay. Under these circumstances, despite a timely re-registration application, no assumption may be made that the application would have been approved or that applicant remained eligible for TPS. *See Gonzalez v. Casey*, No. 3:26-cv-01265-RBM-MMP, 2026 WL 1333767, at *4 (S.D. Cal. May 13, 2026) ("Even if Respondents are

precluded from arguing that DHS's vacatur and termination orders are lawful, and assuming the Supreme Court's stay is lifted, the Court finds that Petitioner's release on the basis of his prior TPS is not appropriate at this time. Petitioner advances no argument or evidence demonstrating that his TPS extended beyond its original expiration on April 2, 2025, without USCIS's approval of his re-registration application.").

Regarding the Supreme Court's stay of the September 5, 2025, order, some courts have found, as did the Ninth Circuit, that the "stays, by their own terms, address only specific orders by the NTPSA court—the preliminary injunction and summary judgment—both of which the Government sought to stay. And while *Boyle* requires courts to exercise caution in exercising equitable discretion in similar cases, it does not authorize this Court to disregard a final declaratory judgment that has not been stayed." *Bello Oropeza*, 2026 WL 1597192, at *7 (citing *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025)). Yet other courts have disagreed with this interpretation. *See Herrera v. Noem*, 825 F. Supp. 3d 1025, 1035 (D. Ariz. 2026) ("Nor does the Court find the NTPSA court's justification for disregarding the Supreme Court's stay orders persuasive. It is true that the Supreme Court did not provide its reasoning for granting the government's request for a stay. But the Supreme Court's exercise of its discretion to grant a stay does not mean nothing, as the NTPSA court treated it.").

The undersigned acknowledges that the law regarding TPS, and in particular Venezuela's TPS designation, has been rapidly evolving in a short time. However, the Supreme Court's reasoning in *Mullin* undermines the basis for the Ninth Circuit's January 28, 2026, decision affirming the September 5, 2025, judgment of the Northern District of California. The Ninth Circuit's decision rested on the fact that 8 U.S.C. § 1254a(b)(5)(A) does not bar judicial review of a claim that the Secretary of DHS exceeded her statutory authority by vacating the prior TPS determination for Venezuela and terminating the 2025 TPS extension. *Nat'l TPS All.*, 166 F.4th at 757, 766. But in *Mullin*, the Supreme Court held that 8 U.S.C. § 1254a(b)(5)(A) precludes judicial review of all non-constitutional claims related to TPS. *See Mullin*, 2026 WL 1825840, at *7. The Supreme Court reversed the lower courts' decisions postponing the effective date of termination of the TPS designation for Syria and for interim relief regarding the termination of TPS for Haiti. It

follows that the same reasoning would apply to the TPS designation of Venezuela such that 8 U.S.C. § 1254a(b)(5)(A) precludes any claims related to the termination of TPS designations. The Supreme Court did not limit this holding to either substantive or procedural questions. Thus, the Secretary of DHS' decision to terminate the TPS designation for Venezuela would be precluded from judicial review. *See id.* ("Each claim concerns a discrete decision made by the Secretary—for example, her decision to consult the State Department in a particular manner and her decision that country conditions in Syria and Haiti justified termination of their TPS designations … So, under any dictionary definition of 'determination,' the judicial-review bar applies to respondents' non-constitutional claims.").

In light of the Supreme Court's decision in *Mullin*, the undersigned finds that the termination of the TPS designation for Venezuela is not subject to judicial review and, therefore, prior vacatur of the determinations of the Secretary of DHS based upon statutory grounds are no longer operative. As such, Petitioner's TPS is terminated. Because Petitioner does not possess TPS, it does not operate to bar his detainment.

**B. Section 1226(c)**

8 U.S.C. § 1226(c)(1)(E) provides in relevant part that "[t]he Attorney General shall take into custody any alien who … is charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense..." 8 U.S.C. § 1226(c)(1)(E). Pursuant to the plain statutory language, a petitioner "need not be convicted of an offense to be subject to mandatory detention under this subsection." *Yaman v. Warden*, No. 1:26-cv-2048-DJC-JDP, 2026 WL 1162729, at *2 (E.D. Cal. Apr. 29, 2026).

Another judge of this Court has addressed and applied the holdings of the key Supreme Court and Ninth Circuit rulings applying § 1226 as relevant here, and the undersigned adopts that analysis herein (*see Kakkar v. Chestnut*, No. 1:25-cv-1627 JLT SAB, 2025 WL 3638298, at *4-5 (E.D. Cal. Dec. 15, 2025)):

> Under this provision, non-citizens may be released "only if the Attorney General decides ... that release ... is necessary to provide protection to a witness, a potential witness, a person cooperating

> with an investigation ... and the alien will not pose a danger to the safety of other[s] ... and is likely to appear for any scheduled proceeding." *Id.* at § 1226(c)(4). Thus, noncitizens detained under this category are not entitled to bond hearings as those detained under § 1226(a) are. *See Jennings v. Rodriguez*, 583 U.S. 281, 303–304 (2018) ("By expressly stating that the covered aliens may be released 'only if' certain conditions are met, § 1226(c)(2), the statute expressly and unequivocally imposes an affirmative *prohibition* on releasing detained aliens under any other conditions.") (emphasis in original).
>
> Section 1226(c)'s mandatory detention requirement applies even if the government does not immediately detain a criminal non-citizen upon immediate release from a correctional facility. *See Nielsen v. Preap*, 586 U.S. 392, 396 (2019) (finding that the Ninth Circuit's interpretation—namely, that criminal aliens not arrested immediately upon release from criminal custody are exempt from § 1226(c)'s mandatory detention and thus entitled to a bond hearing—is wrong). However, the Supreme Court expressly noted that its decision, "on the meaning of that statutory provision[,] does not foreclose as-applied challenges—that is, constitutional challenges to applications of the statute." *Id.* at 420. Courts routinely review as-applied constitutional challenges to § 1226(c) detention. *See e.g., Perera v. Jennings*, No. 21-cv-04136-BLF, 2021 WL 2400981, at *4 (N.D. Cal. June 11, 2021); *Pham v. Becerra*, No. 23-cv-01288-CRB, 2023 WL 2744397, at *5 (N.D. Cal. March 31, 2023); *Carballo v. Andrews*, No. 1:25-cv-00978-KES-EPG, 2025 WL 2381464, at *4 (E.D. Cal. Aug. 15, 2025).

The record shows that Petitioner was arrested on February 4, 2026, and was charged with first degree felony burglary with assault or battery in Osceola County, Florida. The charges remain pending. (Doc. 1 ¶ 35; Doc. 7 at 2; Doc. 7-3; Doc. 7-4). "Felony burglary" clearly implicates the statutory language of section 1226(c)(1)(E). *See Bradley v. State*, 540 So. 2d 185, 187 (Fla. Dist. Ct. App. 1989) (discussing felony burglary). Petitioner's attempt to avoid the consequences of this charge by filing a purported affidavit from the alleged victim of the crime is unavailing. *See* (Doc. 12 at 17-20). Even if the Court could verify and rely upon the document, it does not alter the fact that Petitioner was arrested for such a crime and that charges are pending.

Because the record shows that Petitioner is subject to mandatory detention under § 1226(c) based on his arrest for felony burglary, under the statutory framework above, Petitioner is subject to § 1226(c)(4)'s release provision and therefore is not entitled to bond hearings in the same fashion

as those detained under § 1226(a). Other "courts in this Circuit have declined to find that a petitioner has a due process right to a bond hearing under section 1226(c)." *Yaman*, 2026 WL 1162729, at *2 (citing cases). And mandatory detention under section 1226(c) does not violate Petitioner's due process rights. *See Demore v. Kim*, 538 U.S. 510, 531 (2003) (discussing section 1226(c) and finding that "[d]etention during removal proceedings is a constitutionally permissible part of that process").

Notwithstanding the undersigned's finding that Petitioner is subject to mandatory detention under § 1226(c), here, Petitioner raises a due process argument that his "continued civil detention without a meaningful individualized custody redetermination hearing violates the Due Process Clause of the Fifth Amendment." (Doc. 1 at 12). As explained in the statutory scheme above, Supreme Court precedent "does not foreclose as-applied challenges … to applications of [§ 1226(c)]." *Preap*, 586 U.S. at 420; *Kakkar*, 2025 WL 3638298 at *5.

Therefore, the undersigned considers Petitioner's as-applied challenge to his re-detention raised in his due process claim.

**C. Procedural Due Process**

*i. <u>Governing Authority</u>*

"The Due Process Clause of the Fifth Amendment mandates that '[n]o person shall ... be deprived of life, liberty, or property, without due process of law.'" *United States v. Quintero*, 995 F.3d 1044, 1051 (9th Cir. 2021) (citing U.S. Const. amend. V). "The Due Process Clause 'protects individuals against two types of government action': violations of substantive due process and procedural due process." *Id.* (citing *United States v. Salerno*, 481 U.S. 739, 746 (1987)).

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth … Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). "[F]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). "Procedural due process requires that, even where a deprivation of liberty survives substantive due process scrutiny, the action 'be implemented in a fair manner.'" *Quintero*, 995 F.3d at 1051-52

(citing *Salerno*, 481 U.S. at 746). "The 'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.'" *Mathews*, 424 U.S. at 902 (citation omitted). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

"[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693 (citations omitted); *see Hernandez*, 872 F.3d at 990 ("[I]t is well-established that the Due Process Clause stands as a significant constraint on the manner in which the political branches may exercise their plenary authority."). "In the context of immigration detention, it is well-settled that 'due process requires adequate procedural protections to ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding physical restraint.'" *Hernandez*, 872 F.3d at 990 (quoting *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011)).

*ii.* *<u>Analysis</u>*

On Petitioner's as-applied procedural due process challenge to his continuing detention by immigration authorities, the undersigned considers (1) "whether there exists a protected liberty interest under the Due Process Clause, and … [(2)] the procedures necessary to ensure any deprivation of that protected liberty interest accords with the Constitution." *Garcia v. Andrews*, No. 2:25-cv-01884-TLN-SCR, 2025 WL 1927596, at *2 (E.D. Cal. July 14, 2025) (citing *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989)).

Petitioner has an underlying, continuing liberty interest in being free from re-detention. Specifically, Petitioner was released from custody by ICE over six years prior to his re-detention in February 2026. (Doc. 7 at 1-2). By releasing Petitioner in their discretion, immigration officials necessarily determined that Petitioner did not present a risk of flight or danger to the community. *See* 8 C.F.R. § 1236.1(c)(8) ("Any officer authorized to issue a warrant of arrest may, in the

officer's discretion, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding."); accord *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022).

The undersigned agrees with other courts and other judges of this Court that noncitizens released from immigration custody on parole, general orders of supervision or on their own recognizance have a liberty interest in their freedom that implicates protections under principles of procedural due process. *See Guillermo M.R. v. Kaiser*, 791 F. Supp. 3d 1021, 1031 (N.D. Cal. 2025) ("The fact that Petitioner is subject to discretionary conditions of release likewise does not mean he lacks a protectable liberty interest and can be re-detained without process."); *see id.* ("[E]ven if immigration detainees must wait months before a periodic re-review of their detention, those already released on immigration bond possess an interest in their continued liberty, which grows over time, and a due process right to a hearing before being re-detained."); *Nak Kim Chhoeun v. Marin*, 442 F. Supp. 3d 1233, 1245 (C.D. Cal. 2020). Accord *Doe*, 787 F. Supp. 3d at 1099 (considering in connection with a petitioner's procedural due process claim that "[t]he lengthy duration of his conditional release as well as the meaningful connections Petitioner seems to have made with his community during that time create a powerful interest for Petitioner in his continued liberty"); *Ramazan M. v. Andrews*, No. 1:25-cv-01356-KES-SKO (HC), 2025 WL 3145562, at *5-6 (E.D. Cal. Nov. 10, 2025) ("Even when a statute allows the government to arrest and detain an individual, a protected liberty interest under the Due Process Clause may entitle the individual to procedural protections not found in the statute"). *Cf. Daley v. Andrews*, No. 1:25-cv-00922-KES-CDB, 2026 WL 101840, at *9-10 (E.D. Cal. Jan. 14, 2026) (finding a petitioner mandatorily detained pursuant to § 1226(c) did not have a protectible liberty interest because he had remained in continuous custody and never released on supervision).

Respondents assert that Petitioner is an "applicant for admission" and is "subject to mandatory detention" under 8 U.S.C. § 1225(b)(2). (Doc. 7 at 2; citing, *inter alia*, *Alonzo v. Noem*, No. 1:25-cv-01519 WBS SCR, 2025 WL 3208284 (E.D. Cal. Nov. 17, 2025)). The petitioners'

circumstances in *Alonzo* are factually dissimilar from those presented here, as another judge of this Court has explained: Petitioner here was detained by ICE and released, and immigration proceedings have remained pending for a significant period of time. *See Garcia v. Chesnut*, No. 1:25-cv-01907-JLT-CDB, 2025 WL 3771348, at *8 (E.D. Cal. Dec. 31, 2025) ("However, unlike here, the petitioners in *Valencia* and *Alonzo* had never been encountered, let alone processed, by immigration officials, and had not been released on recognizance pending completion of Section 240 removal proceedings.").

Additionally, other judges of this Court, as well as many other courts, have considered and rejected the government's arguments, finding that § 1226(a), not § 1225(b)(2), provides the appropriate framework for noncitizens released following their initial encounter with immigration authorities and have resided in the United States for a significant period, like Petitioner here (notwithstanding, however, that Petitioner is detained under § 1226(c)). *See, e.g.*, *H.J.G.G. v. Wofford*, No. 1:25-cv-01718-JLT-EPG-HC, 2025 WL 3761803, at *4 (E.D. Cal. Dec. 30, 2025) (citing *Castillo v. Wofford*, No. 1:25-cv-01586-JLT-HBK, 2025 WL 3466064, at *8 (E.D. Cal. Dec. 2, 2025)); accord *Valencia Zapata v. Kaiser*, 801 F. Supp. 3d 919, 935-37 (N.D. Cal. 2025), *appeal filed*, No. 25-7472 (9th Cir. Nov. 26, 2025). Under such circumstances, "the government cannot switch tracks" and subject Petitioner to mandatory detention now under section 1225(b)(2) "after it previously released him on his own recognizance under section 1226(a)." *Valencia Zapata*, 801 F. Supp. 3d at 936; accord *Souza v. Robbins*, No. 1:25-cv-01597-DJC-JDP, 2025 WL 3263897, at *2 (E.D. Cal. Nov. 23, 2025).

Because Petitioner has shown he has a protected liberty interest to remain free from re-detention based on his discretionary release in September 2019, the undersigned must determine what process is due before the government may terminate that liberty interest. To determine this, the undersigned considers the following factors articulated in *Mathews*: "[(1)] the private interest that will be affected by the official action; [(2)] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [(3)] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Mathews*, 424 U.S. at 335; *see Hernandez*, 872 F.3d at 993-94 (applying *Mathews* test in immigration detention context); *id*. at 993 ("The appropriateness of the requirement that ICE and IJs consider financial circumstances and alternative conditions of release is confirmed by the balance of factors under *Mathews*[.]").

As to the first factor, Petitioner has shown he has a significant private interest in remaining on release from detention. He had been released from immigration custody for over six years prior to his re-detention. (Doc. 7 at 1-2). According to attachments to his petition, Petitioner has raised a family and integrated himself into his local community. *See. e.g.,* (Doc., Exs. Q, R, S). Petitioner's continued liberty interest in remaining on release is undermined by his re-detention without a bond hearing. *Doe*, 787 F. Supp. 3d at 1093-94 ("Freedom from imprisonment is at the core of the Due Process Clause…. The lengthy duration of his conditional release as well as the meaningful connections [he] seems to have made with his community during that time create a powerful interest for [him] in his continued liberty.").

As to the second factor, the risk of an erroneous deprivation of Petitioner's liberty interest is considerable here where he has not received any bond or custody redetermination. *Id*. at 1094; *A.E. v. Andrews*, No. 1:25-cv-00107-KES-SKO, 2025 WL 1424382, at *5 (E.D. Cal. May 16, 2025). Because there were no procedural safeguards to determine if Petitioner's re-detention was justified, the probable value of the additional procedural safeguard of a bond hearing to determine whether Petitioner is a flight risk or a danger to the community is high such that this factor weighs in favor of granting a bond hearing. *See Doe*, 787 F. Supp. at 1094 ("[G]iven that Petitioner was previously found to not be a danger or risk of flight and the unresolved questions about the timing and reliability of the new information, the risk of erroneous deprivation remains high."); *A.E.*, 2025 WL 1424382 at *5; *Ramazan*, 2025 WL 3145562, at *6. Therefore, this factor weighs in favor of granting a bond hearing. *See Rivera Rodriguez v. Warden, California City Det. Facility*, No. 1:26-CV-01373-DC-SCR, 2026 WL 1536775, at *4 (E.D. Cal. June 1, 2026) (finding this factor weighed in favor of petitioner detained under 1226(c) due to a theft conviction).

Third, the government has an "obvious interest in 'protecting the public from dangerous criminal [noncitizens].'" *Rodriguez Diaz*, 53 F.4th at 1208 (quoting *Demore*, 538 U.S. at 515).

Thus, the government has a general interest in detention of non-citizens held under section 1226(c). However, "'the additional procedural safeguards we would allow here under *Mathews* do nothing to undercut those interests. At any ordered bond hearing, the IJ would assess on an individualized basis whether the noncitizen presents a flight risk or a danger to the community, as IJs routinely do for other noncitizen detainees.'" *Rivera Rodriguez*, 2026 WL 1536775, at *4 (quoting *Black v. Decker*, 103 F.4th 133, 153-54 (2d Cir. 2024), *cert. granted sub nom. Genalo v. Black*, No. 25-886, 2026 WL 1718025 (U.S. June 15, 2026)). Even considering the administrative burden, the government's interest in detaining Petitioner without a bond hearing is minimal. Bond hearings are routinely conducted and impose only a minimal cost on the government. *See id.* ("respondents' interest is further diminished by the low fiscal and administrative burdens associated with a bond hearing").

**D. Remedy**

For the foregoing reasons, the undersigned finds that a post-deprivation bond hearing is the appropriate remedy in this action, and where the government bears the burden to show by clear and convincing evidence that Petitioner presents a risk of flight or danger to the community. Petitioner has been detained for approximately five months and has a master calendar hearing scheduled at the end of July 2026. However, the hearing is not the end of Petitioner's immigration proceedings. Any decision rendered at the hearing may be appealed by either Petitioner or Respondents, first to the Board of Immigration Appeals and then to the Ninth Circuit. *See Rivera Rodriguez*, 2026 WL 1536775, at *4 (citing cases and granting post-deprivation bond hearing for petitioner detained for six months under section 1226(c) with upcoming hearing, with burden on the government to show by clear and convincing evidence risk of flight or danger).

Therefore, the undersigned will recommend that Petitioner's petition be granted.

## V. Conclusion and Recommendation

Accordingly, IT IS HEREBY RECOMMENDED that:

1. The petition for writ of habeas corpus (Doc. 1) be GRANTED.
2. Petitioner's motion for issuance of order to show cause (Doc. 2) be DENIED as moot.
3. Respondents be ORDERED to provide Petitioner with a bond hearing within 14 days

of the date of the order, at which Petitioner's eligibility for bond must be considered, and where the government must demonstrate by clear and convincing evidence that Petitioner is a flight risk or danger to the community, such that continuing physical custody is legally justified.

4. Respondents be DIRECTED to file a status report certifying compliance with the order within five (5) days of the bond hearing.
5. The Clerk of the Court be DIRECTED to enter judgment in favor of Petitioner and close this case.

These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). **Within seven (7) days** after being served with these findings and recommendations, the parties may file written objections with the Court. Although this objection period is shorter than provided by Local Rule, such an adjustment is warranted given the nature of Petitioner's harm, the finding of a violation of the U.S. Constitution by Respondents, and the fact that the parties have extensively briefed the issues involved. *See United States v. Barney*, 568 F.2d 134, 136 (9th Cir. 1978) (per curiam) ("The court may require a response within a shorter period if exigencies of the calendar require."). The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations" and **shall not exceed 15 pages** without leave of Court and good cause shown. The Court will not consider exhibits attached to the Objections, but a party may refer to exhibits in the record by CM/ECF document and page number. Any pages filed in excess of the 15-page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. § 636(b)(l)(C).

A party's failure to file any objections within the specified time may result in the waiver of certain rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated: **July 20, 2026**

UNITED STATES MAGISTRATE JUDGE